**Opinion issued March 21, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00697-CV**

———————————

**IN THE INTEREST OF A.C.K. A/K/A A.K., A CHILD**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-01389J**

---

**MEMORANDUM OPINION**

The Texas Department of Family and Protective Services ("DFPS" or "the Department") sought to terminate the parental rights of A.H. ("Mother") to her minor daughter, A.C.K. *a/k/a* A.K. ("Amelia").[1] Following a bench trial, the trial court

---

[1] In this opinion, we use pseudonyms for the minor child, her parents, her extended family members, and her foster family to protect their privacy. *See* TEX. R. APP. P. 9.8(b)(2).

found by clear and convincing evidence five statutory predicate grounds supporting termination. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O), and (P). The trial court also found by clear and convincing evidence that termination of Mother's parental rights was in Amelia's best interest. The trial court signed an order terminating Mother's parental rights and appointing DFPS as Amelia's sole managing conservator.

On appeal, Mother raises six issues. In her first five issues, she argues that DFPS did not present legally or factually sufficient evidence to support any of the five predicate grounds for termination found by the trial court. In her sixth issue, Mother argues that legally and factually sufficient evidence does not support the trial court's finding that termination of her parental rights was in Amelia's best interest.

We render judgment in part, reverse and remand in part, and affirm in part.

## Background

Mother and S.K. ("Father") have been in a relationship for four or five years and they have two children together: A.K. ("Anna") and Amelia. Father also has two older children. Amelia was the only child involved in the underlying proceeding.[2]

---

[2] At the start of trial, Father voluntarily relinquished his parental rights to Amelia. In its final decree, the trial court terminated Father's parental rights on this basis. *See* TEX. FAM. CODE §§ 161.001(b)(1)(K) (providing that trial court may terminate parent-child relationship if court finds by clear and convincing evidence that parent has executed "an unrevoked or irrevocable affidavit of relinquishment of parental rights"), 161.103(a)–(b) (setting out requirements for affidavit of voluntary relinquishment). Father did not file a notice of appeal of the trial court's decree, and he is not a party to this appeal.

Anna was born in July 2021 and has lived in Texas, Montana, and Florida. At some point, Child Protective Services ("CPS") in Montana became involved in Anna's life. Montana CPS opened an investigation into Mother and Father, but this investigation has been closed. Although Mother and Father retain their parental rights to Anna, they do not have custody of her. Instead, Mother and Father entered into a guardianship agreement giving custody of Anna to a guardian ("Anna's caregiver" or "the caregiver").

### Removal of Amelia

Amelia was born in Houston in August 2022. Immediately after Amelia's birth, the Department received a referral alleging neglectful supervision of Anna and Amelia. According to the removal affidavit, which was submitted with the Department's original petition and admitted into evidence at trial:

> The report stated that [Anna] is currently in Montana, after the state of Montana had negotiated guardianship with the maternal grandmother in Florida and the child was returned to the mother [and] father who fled to Texas. [Mother], [Father] and the child returned to Montana after CPS case was opened in Texas. [Anna] is currently with protective caregiver in Montana, it was known that [Mother] was due in August and suspected she had given birth to unknown sibling [Amelia]. Report stated that [Mother] heavily consumed alcohol all [through] pregnancy and would drive with [Anna] while under the influence of alcohol.

Five days after Amelia's birth, the initial DFPS caseworker confirmed that Mother and Father had a reservation at a motel in Houston. Although she was unable to meet with the parents, she left her business card. Mother then called the

3

caseworker and stated that she was not in Texas and had not given birth. The caseworker contacted local law enforcement and requested a welfare check at the motel. The parents answered, but when the caseworker tried to explain why she was there, Mother stated that the caseworker "had no reason to be there and she had no information to give" the caseworker. Mother and Father declined to participate in any interviews, with Mother stating that "her CPS case was closed and her newborn child had just been born." Mother refused to let the caseworker see Amelia's sleeping arrangements, but Mother stated that the caseworker could return the following day.

A different caseworker visited Mother at the motel the next day. Although Father's belongings were in the room, Mother denied that anyone else was living with her and Amelia. She claimed that Father was "there visiting her while she had the baby," but he was not living with her because he "was in San Diego working." Father, however, returned to the motel room during the interview, but Mother continued to claim that he was "only visiting." Mother became agitated and upset. The caseworker attempted to leave the property, but Mother followed the caseworker to her car while asking, "So now what, are you going to take my damn baby?" The caseworker spoke with the front desk clerk, who informed her that Mother and Father had gotten into an argument the previous evening which had been overheard by the motel groundskeeper.

4

The caseworker then contacted authorities in Montana and learned that their investigation into Mother was dismissed because Mother had left the state. Anna was currently living with the caregiver in Montana. The Montana authorities informed the caseworker that Mother had open warrants in three states, including charges for felony assault and disorderly conduct. Anna's caregiver informed the caseworker that she had called Mother approximately two days after Mother gave birth to Amelia, and the caregiver "could tell [Mother] was intoxicated and impaired." The caseworker spoke with Mother again, but Mother "continued to deny the current allegation, the verbal dispute from the night before, and her criminal history," and she denied "having an active charge for endangering a child."

The removal affidavit also recounted the following "CPS History" from April 2022:

> On April 13, 2022 The Department of Family and Protective Services received a referral stating that [M]other was a prostitute who was 5 months pregnant at the time and took [Anna] with her[.] [T]here is concerns of the mother being under the influence and her ability to care for the child, second report stated [M]other was intoxicated and had gotten into a physical altercation at [a] shelter with [an] unknown resident, a third report was called in after [Mother] was observed to be pushing [Anna] along [a] state highway while being intoxicated. [Mother] was arrested and charged with child endangerment. The allegations of Neglectful Supervision [were] found reason to believe due to [Mother] being charged with child endangerment after being found intoxicated walking on an interstate facing towards traffic and near oncoming traffic.

The removal affidavit reported that Mother's criminal history consisted of a May 2022 felony charge for "Abandon/Endanger Child Criminal Negligence."

The Department initiated the underlying proceeding one week after Amelia's birth. The Department requested emergency removal of Amelia and temporary managing conservatorship. The Department also requested that if Amelia could not be reunited safely with Mother or Father, then the trial court appoint a relative, another suitable person, or the Department itself as Amelia's sole managing conservator. In the alternative, the Department sought termination of Mother's and Father's parental rights to Amelia based on several different statutory predicate grounds.

*The Service Plan*

DFPS created family service plans for both Mother and Father. Mother's service plan required her to maintain stable housing and income; actively participate in and complete parenting classes; complete a substance abuse assessment and follow all recommendations; complete a psychosocial assessment and follow all recommendations; attend hearings, permanency conference meetings, and family visits; maintain contact with her caseworker; refrain from engaging in criminal activity; and build a support network of family and friends. The service plan informed Mother that if she tested positive for any drugs during her substance abuse assessment, DFPS would then ask for random drug testing during the pendency of

the case. The trial court approved Mother's service plan and made it an order of the court.

*Trial*

Trial occurred on two days in August 2023, around the time of Amelia's first birthday. Father testified that Anna was currently in Montana with the caregiver due to his and Mother's "[u]nstable living situation." Father had been attempting to obtain housing for "the past two years now," but he had been unsuccessful. Although Father was trained as an HVAC technician, he had been unable to find a stable job. Mother had also been unable to find steady employment.

While the case involving Amelia was pending, Father was in Florida for two or three months visiting one of his other children. Mother was not with him in Florida, and he testified that they "probably were split apart" at that time.

Father testified that Mother never spoke to him in a manner that indicated that she was intoxicated, and although he had seen her drink alcohol, she had never been intoxicated in Father's presence. Father agreed that Mother had a problem with abusing alcohol "in the past." He denied that Mother was ever belligerent or argumentative with him; instead, she was "just sad, kind of." He did not believe that Mother would be a danger to her children due to her alcohol usage. Father also denied any knowledge that Mother had a criminal history relating to alcohol abuse,

such as a DWI conviction. He did not believe that Mother had used any drugs other than alcohol.

Father acknowledged that he and Mother had argued in the past. He agreed with Mother's counsel that while Mother could "get very passionate about her arguments," there had never been domestic violence between them. In October 2021, Mother, Father, and the boyfriend of Anna's caregiver ("the boyfriend") were all involved in an altercation in Montana in which Mother and the boyfriend both displayed knives.[3] Father testified that the boyfriend had a big knife or machete in his hands, and he was "going towards" Mother. Mother had a knife in her hand to defend herself. Father got in between them, "pulled the knife out of [Mother's] hand," and his hand was cut in the process.

Father agreed that he and the boyfriend were listed as complainants in two assault charges pending against Mother. When asked if he was aware that the cases were scheduled to go to trial in October 2023, Father responded, "I believe they were closed." He testified that he did not make a complaint to the police about Mother assaulting him, and he did not believe Mother should have been charged with assault arising out of that incident.

Mother believed that Amelia came into DFPS's care "because somebody called in allegations that were not true or correct," specifically "[t]hat alcohol was a

---

[3]     Father testified that Anna was not present during this incident.

factor." She denied drinking alcohol around Amelia's birth, stating that she was required to take a breathalyzer test every 12 hours due to a prior criminal case,[4] and she had been doing that for several consecutive months. Mother acknowledged that she had a past history of alcohol problems over the course of several years, but she testified that she has never drank in front of her children, and she took her last drink shortly after Amelia's removal in August 2022.

Mother was accepted for inpatient substance abuse treatment at Santa Maria Hostel in June 2023. Mother was drug tested frequently at Santa Maria, and all her tests were negative. Mother testified that she was in the process of deciding to leave Santa Maria when she was discharged from the program for having inappropriate contact with another patient. Although she was discharged from inpatient treatment, Mother was completing outpatient services through Santa Maria three times per week. She estimated that she had gone to approximately ten AA meetings.

Mother also testified that almost two years before trial, she had voluntarily gone through an alcohol rehabilitation program in Montana on a friend's recommendation to help with a pending criminal case. Mother did not participate in

---

[4]    Mother testified that this criminal case was "an assault charge that later on got dropped down to a criminal endangerment charge" and involved "back and forth arguing between [her] and [her] roommates" while Father was present. It is not clear from the appellate record whether this incident is the same incident as the altercation with the boyfriend.

this program for very long, in part because it reminded her of jail and she lacked support, so she was not motivated to continue.

Mother testified that she was in substance abuse treatment "right now" so she could regain custody of Amelia. She delayed going to Santa Maria "for the mere fact that [she] had a lot of things [she] had to take care of beforehand." When asked what she had to take care of before entering treatment, Mother testified:

> I had a storage unit that had everything that belonged to me, [Father], and [Amelia], and [Anna] in it that was past due by a few months. I needed to get up the money for that. As well as I was trying to handle my business as far as show my own sobriety to you guys on my own; as well as do my treatment plan on my own; have a job; show stability; everything as such as that; as well as pay my fines and my fees so my [driver's] license doesn't get suspended.

Mother testified that she had fines and fees from past criminal charges including disorderly conduct, criminal trespass, and a suspended license. She stated that she had one pending criminal charge in Montana that was being changed to criminal endangerment. At the time of trial, Mother had not completed all the tasks on her service plan, but she testified that she had completed the psychosocial evaluation, the substance abuse evaluation, and the mental health evaluation. She had also participated in individual counseling and had three more sessions to complete.

Mother testified that while this case had been pending, she was in jail in Harris County for over three months on a child endangerment charge. This charge was based on "[w]alking down a bicycle lane," and Mother denied that alcohol was

involved. Mother testified that around 11:00 p.m. one evening, she was walking on a sidewalk with Anna in a jogging stroller. Mother tried to push the stroller through the grass, but she and Anna "both were knocking side to side," and the stroller was not "going straight through," so she briefly walked in the bicycle lane for a "very short distance." Mother suspected that someone at a nearby store saw her and thought she looked intoxicated, so they called the police. Mother testified that although the police tested her for alcohol when they stopped her, she tested negative.

Following this charge, Mother was then extradited to Montana for violating the terms of pretrial release because she "blew dirty" on a breathalyzer test when DFPS took custody of Amelia in August 2022. She was only in jail for around a week, but she had to stay in Montana for around six weeks before she obtained permission from Montana authorities to leave the state. Due to Mother's incarceration in the Harris County Jail and in Montana, she had visited with Amelia only six times during the pendency of the case.[5]

The trial court admitted into evidence drug test results from June 2023—before Mother started treatment at Santa Maria—reflecting that Mother's urine sample tested positive for alcohol. Specifically, the results reflected that Mother

---

[5] Mother testified that she visited Amelia "every single time that lady gave [her] visit," except for one time when her car broke down and a few other visits because she was living in Galveston and did not have a vehicle. Mother testified that it was not her intention to miss visits with Amelia.

11

tested positive for "ethyl glucuronide" at a level of 270 ng/mL and "ethyl sulfate" at a level of 2000 ng/mL. The Department did not present any testimony interpreting these results. When asked about the test, Mother testified that she was told "it could have been a problem with whatever [she] ate or possible mouthwash because it's very low."

Mother testified that she and Father gave Anna to the caregiver in July 2022. The caregiver then obtained a protective order against Mother in October 2022 that prevented Mother from having any interaction with Anna and the caregiver. With respect to the incident concerning the boyfriend, Mother testified that this occurred in October 2021, before the protective order. Mother testified that she tried to file charges against the boyfriend, but police stopped her from doing so and instead the boyfriend filed charges against her. The charges against Mother from that incident were still pending. Mother denied ever having a physical altercation with Father.

LaQuesha Owens, the DFPS caseworker at the time of trial, testified that while Mother was pregnant with Amelia, DFPS received a referral concerning Anna. Mother took Anna back to Montana, and after she returned to Texas and gave birth to Amelia, DFPS received a second referral based on neglectful supervision of Amelia. Owens testified that DFPS took Amelia into its care because there were "allegations of domestic violence with the parents" and because Mother "had a child endangerment charge that she's now on probation for." Owens acknowledged that

there was no confirmation that domestic violence had occurred between Mother and Father in Texas.

The trial court admitted an order of deferred adjudication signed by the presiding judge of the 263rd District Court of Harris County on January 11, 2023. This order reflected that Mother pleaded guilty to the state-jail felony offense of endangering a child, but the trial court deferred adjudication of guilt and placed Mother on community supervision for two years. Although Mother testified that she was not intoxicated at the time of this offense, Owens testified that "the affidavit"[6] concerning the offense stated otherwise.

Owens testified that Mother did not regularly visit Amelia while the case was pending. Mother visited Amelia on six occasions, including one visit that occurred at Santa Maria. Mother attended some visits, but then she did not have reliable transportation, she could not pay gas money to someone else to take her to visitations, and then she was arrested in October 2022. In the Department's view, only visiting Amelia six times constituted constructive abandonment.

Owens also testified concerning Amelia's well-being in her foster care placement. At the time of Owens' testimony during the second day of trial, Amelia

---

[6] Presumably, Owens was referring to the removal affidavit submitted with DFPS's original petition. When DFPS's counsel asked if the affidavit had been admitted into evidence, Owens responded, "I believe so." The trial court admitted the removal affidavit into evidence. Aside from the deferred adjudication order, no other documentary evidence concerning this offense was admitted into evidence.

had just had her first birthday. Owens testified that Amelia was "thriving," "on target," "stable," and a "happy little child." Amelia loved her foster parents and was bonded with them. According to Owens, "[t]here's stability there" in Amelia's foster placement that Amelia did not have while in Mother's and Father's care. The foster parents were willing to maintain contact between Amelia and Anna, and they were willing to adopt Amelia.

Amelia's Foster Mother testified that Amelia is "very attached" to both her and her husband, and Amelia had just started calling her Foster Father "dad." Foster Mother believed that Amelia was "on track" developmentally, and she had no health concerns.

Following trial, the trial court signed an order terminating Mother's parental rights to Amelia. The trial court found by clear and convincing evidence five statutory predicate grounds for termination: Family Code subsections 161.001(b)(1)(D), (E), (N), (O), and (P). The court also found that termination of Mother's parental rights was in Amelia's best interest. The court appointed DFPS as Amelia's sole managing conservator. This appeal followed.

**Statutory Predicate Grounds for Termination**

In her first five issues on appeal, Mother challenges the legal and factual sufficiency of the evidence supporting each of the predicate grounds for termination

that the trial court found in its termination order: Family Code subsections 161.001(b)(1)(D), (E), (N), (O), and (P).

## A. *Standard of Review*

Parents have a fundamental right to make decisions concerning the care, custody, and control of their children. *In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023); *see Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (stating that parent's right to companionship, care, custody, and management of their children "is an interest far more precious than any property right"). When the State, through DFPS, initiates a proceeding to terminate parental rights, "it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759; *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (noting that terminating parent-child relationship "imposes permanent, irrevocable consequences").

Parents have a "commanding" interest in the "accuracy and justice" of the decision to terminate their parental rights. *Santosky*, 455 U.S. at 759. We therefore strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *In re J.G.S.*, 574 S.W.3d 101, 113 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). However, the rights of the natural parent "are not absolute" because "protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)).

15

When the Department seeks to terminate a parent's rights to her child, it must establish, by clear and convincing evidence, that (1) the parent committed one or more of the statutory predicate grounds justifying termination and (2) termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b); *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (stating that due process mandates clear and convincing evidence standard of proof in parental termination cases). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

Due to the higher standard of proof required at trials for termination of parental rights, we apply a heightened standard of review on appeal. *In re N.G.*, 577 S.W.3d at 235; *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). In a legal sufficiency review, we must determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Giving deference to the factfinder, we look at all the evidence in the light most favorable to the finding, assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). However, we may not disregard undisputed facts that do not support

16

the finding. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). The factfinder is the sole judge of the witnesses' credibility and demeanor. *Id.*; *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021) (noting that heightened appellate standard of review "does not dispel . . . the deference that an appellate court must grant to the factfinder, who heard the witnesses and evaluated their credibility").

In a factual sufficiency review, we weigh disputed evidence contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We must consider whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that the finding was true. *In re A.B.*, 437 S.W.3d at 503 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

Even under this standard, we must "still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *Id.* In a bench trial, the trial court as the factfinder weighs the evidence, assesses the credibility of witnesses, and resolves conflicts and inconsistencies in the evidence. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

If we reverse a termination judgment based on factual insufficiency, we must detail the relevant evidence and clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence. *In re A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d 17, 19 (Tex. 2002)). This requirement ensures that we appropriately respect the factfinder's "fact-finding function." *Id.*

Only one predicate finding under Family Code section 161.001(b)(1) is necessary to support a judgment terminating a parent's rights when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362; *see In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam). However, termination based on predicate grounds (D) and (E) can form the basis to terminate a parent's right to another child. *See* TEX. FAM. CODE § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d at 234. Due process therefore requires a heightened standard of review of a trial court's finding under subsection (D) or (E), "even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child." *In re N.G.*, 577 S.W.3d at 235. When a parent challenges a finding under subsection (D) or (E) on appeal, we must review the finding because doing otherwise "deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." *Id.*

### B. *Sufficiency of the Evidence to Support Predicate Findings*

#### 1. Sections 161.001(b)(1)(D) and (E)

The trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Under a related provision, the trial court may terminate a parent's rights if the court finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

The Texas Supreme Court has repeatedly held that to "endanger" means "to expose to loss or injury; to jeopardize." *E.g.*, *In re J.W.*, 645 S.W.3d at 748 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *In re J.F.-G.*, 627 S.W.3d at 312. "Endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it does not require that conduct be directed at the child or that the child actually suffer injury. *In re J.W.*, 645 S.W.3d at 748 (quoting *Boyd*, 727 S.W.2d at 533); *see Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (stating that danger to child "may be inferred from parental misconduct" even if conduct is not directed at child and child does not suffer injury). Endangerment can

occur through both acts and omissions. *In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

Subsection (D) "focuses on the child's environment." *In re J.W.*, 645 S.W.3d at 749; *In re M.D.M.*, 579 S.W.3d at 764. "[I]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *In re M.D.M.*, 579 S.W.3d at 764 (quoting *Jordan*, 325 S.W.3d at 721). This inquiry centers on the child's physical environment, "although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being." *Id.* (quoting *Jordan*, 325 S.W.3d at 721); *see In re J.W.*, 645 S.W.3d at 749 ("The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry."); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home.").

A child is endangered when the child's environment "creates a potential for danger that the parent is aware of but consciously disregards." *In re S.R.*, 452 S.W.3d at 360. Subsection (D) permits termination if DFPS proves that the "parent's conduct caused a child to be placed or remain in an endangering environment," and

termination "may be based upon only a single act or omission." *In re M.D.M.*, 579 S.W.3d at 764. Generally, the relevant period for reviewing parental conduct and the child's environment under subsection (D) is before the Department removes the child from the parent's care. *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.); *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (stating that relevant time period under subsection (D) is prior to child's removal "since conditions or surroundings cannot endanger a child unless that child is exposed to them"); *see In re J.W.*, 645 S.W.3d at 749 & n.12 (generally agreeing with this reasoning but refusing to "foreclose the possibility that Subsection (D) could apply post-removal depending on the facts").

Under subsection (E), we consider whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *In re M.D.M.*, 579 S.W.3d at 764. Termination under this subsection "must be based on a voluntary, deliberate, and conscious course of conduct" rather than a single act or omission. *J.O. v. Tex. Dep't of Fam. & Protective Servs.*, 604 S.W.3d 182, 191 (Tex. App.—Austin 2020, no pet.) (internal quotations omitted); *In re M.D.M.*, 579 S.W.3d at 764. However, the conduct does not have to occur in the presence of the child. *In re M.D.M.*, 579 S.W.3d at 764; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (stating that "endangering conduct is not limited to actions directed towards the child" and that such conduct "may include the parent's actions before the child's

21

birth"). We may consider evidence relating to how a parent has treated another child or a spouse. *In re M.D.M.*, 579 S.W.3d at 764. We may also consider conduct occurring both before and after DFPS removes the child from the parent's care. *In re S.R.*, 452 S.W.3d at 360.

"Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan*, 325 S.W.3d at 723. Evidence that a parent uses narcotics or abuses alcohol can support a finding that the parent has engaged in a course of conduct that endangers the child. *In re S.N.*, 272 S.W.3d 45, 62 (Tex. App.—Waco 2008, no pet.) (op. on reh'g). Additionally, a parent's abusive and violent criminal conduct "can also produce an environment that endangers a child's well-being, and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future." *In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

A parent's criminal history can support an endangerment finding, and we consider the nature of the crimes, the duration of incarceration, and whether a "pattern of escalating, repeated convictions exists." *In re J.F.-G.*, 627 S.W.3d at 313; *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.). "Routinely subjecting a child to the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being." *In re*

*J.S.*, 584 S.W.3d at 635 (quoting *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.)). A criminal offense occurring before a child was born "can be a relevant factor in establishing an endangering course of conduct." *In re E.N.C.*, 384 S.W.3d 796, 804–05 (Tex. 2012); *In re J.S.*, 584 S.W.3d at 635–36.

With respect to subsection (D), the record contains little evidence concerning Amelia's living environment before her removal from Mother's care. It is undisputed that Mother, Father, and Amelia were living in a motel at the time of the removal. Amelia was approximately one week old. Although the initial caseworker averred in the removal affidavit that she spoke with Mother and Father in the motel room, the caseworker provided no information concerning the cleanliness of the room or whether any safety hazards were present. There is no evidence that any other people were staying in the room, and there is no evidence that drugs or alcohol was present.

The initial referral to DFPS indicated that domestic violence was a concern, noting that the motel groundskeeper had overheard Mother and Father having an argument. At trial, Mother and Father both denied that any domestic violence had occurred in their relationship. Owens, the DFPS caseworker, acknowledged that the allegation of domestic violence between Mother and Father in Texas had not been confirmed.

The record does contain evidence concerning Mother's alcohol usage around the time of Amelia's birth. The initial referral reported that Mother had "heavily

consumed alcohol all [through her] pregnancy" with Amelia and that she "would drive with [Anna] while under the influence of alcohol." The caseworkers did not mention whether Mother appeared intoxicated on the occasions that they spoke with her at the motel prior to Amelia's removal. However, one of the caseworkers averred that she received information from Anna's caregiver that the caregiver had called Mother a few days after Amelia's birth and "could tell [Mother] was intoxicated and impaired." There is no evidence that Mother was intoxicated at the time of Amelia's birth. The appellate record does not contain any medical records for either Mother or Amelia suggesting that Amelia suffered any adverse health effects due to Mother's alcohol usage. At the time of trial, one-year-old Amelia had no health concerns.

DFPS had also received a prior referral several months before Amelia's birth in which Mother "was observed to be pushing [Anna] along [a] state highway while being intoxicated," an incident that led to a felony child endangerment charge in Harris County. Although Mother denied that she had been intoxicated on that occasion, she pleaded guilty to that charge in January 2023 and was placed on deferred adjudication community supervision for two years. Mother admitted that she "blew dirty" on a breathalyzer around the time of Amelia's removal, but the record contains no evidence of what Mother's blood alcohol concentration had been at the time of removal, and no drug test results from this time were admitted into

evidence. Owens testified that she had never seen Mother "under the influence of alcohol."

Although the parent's conduct is relevant to the subsection (D) inquiry because parental conduct can produce an environment that endangers the child's well-being, the focus is on the child's physical environment and the acceptability of the child's living conditions. *See In re J.W.*, 645 S.W.3d at 749; *In re M.D.M.*, 579 S.W.3d at 764; *In re S.R.*, 452 S.W.3d at 360. Here, there is no evidence concerning the physical environment at the time of Amelia's birth and before her subsequent removal, aside from the fact that Amelia and her parents were living in a motel. As discussed above, there is no evidence that the motel room was not safe.

DFPS presented some evidence—through the allegations in the removal affidavit—that Mother had used alcohol while caring for Anna, while she was pregnant with Amelia, and shortly after Amelia's birth. Mother also acknowledged that she had had trouble with alcohol in the past, and she "blew dirty" on a breathalyzer test around the time of Amelia's removal. Mother's discharge form from Santa Maria included statements that her diagnosis at the beginning of her treatment was "Alcohol use disorder, Severe" and that Mother "meets the DSMV criteria for alcohol use disorder." There is no evidence, however, concerning how often Mother drank alcohol, the degree to which she became intoxicated when she drank, whether she kept alcohol around her children, or whether she allowed

25

dangerous individuals around her children when she was drinking. Nor does the record contain any evidence that Mother's alleged use of alcohol during her pregnancy had any adverse health effects on Amelia. To the contrary, Amelia's Foster Mother testified that Amelia had no health concerns.

We conclude that, considering the evidence in the light most favorable to the trial court's finding that Mother violated subsection (D), a reasonable factfinder could not have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Amelia to remain in conditions or surroundings which endangered Amelia's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.W.*, 645 S.W.3d at 748 (stating that "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment"). We therefore hold that the trial court's finding under subsection (D) was not supported by legally sufficient evidence. We sustain Mother's first issue.

With respect to subsection (E), we may consider parental conduct that occurs before and after both the child's birth and the child's removal from the parent's care to determine whether the Department established that the parent engaged in a course of conduct that endangered the child's well-being. *See In re J.O.A.*, 283 S.W.3d at 345; *In re S.R.*, 452 S.W.3d at 360. The Department presented evidenced that Mother had engaged in criminal conduct prior to Amelia's birth. Specifically, following an

26

April 2022 incident involving Mother pushing Anna in a stroller, Mother was charged with the felony offense of child endangerment. Although the facts surrounding this offense—including whether Mother was intoxicated at the time—were disputed, Mother pleaded guilty to this offense, a Harris County trial court deferred adjudication of guilt, and the court placed Mother on community supervision for two years beginning in January 2023.

DFPS also presented evidence that Mother was facing at least two pending charges in Montana.[7] In October 2021, Mother was involved in an altercation with the boyfriend of Anna's caregiver. During this incident, Mother wielded a knife, and Father was injured. Mother was charged with two counts of felony assault, with the boyfriend and Father named as the complainants. At the time of trial in the underlying proceeding, these charges were still pending. Therefore, Mother still faced the possibility of criminal penalties due to these charges. *See In re K-A.B.M.*, 551 S.W.3d 275, 285 (Tex. App.—El Paso 2018, no pet.) ("The commission of criminal conduct by a parent may support termination under Section 161.001(b)(1)(E) because it exposes the child to the possibility that the parent may be imprisoned."); *In re N.J.H.*, 575 S.W.3d at 832 (stating that parent's abusive and

---

[7] During her testimony, Mother referenced an assault charge that "later on got dropped down to a criminal endangerment charge" and involved "back and forth arguing between [her] and [her] roommates." Father was present during this incident. No further details were presented. It is unclear if this incident that Mother described is the same as the one involving the boyfriend of Anna's caregiver.

violent criminal conduct can produce endangering environment, and "evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future"). Mother also agreed that Anna's caregiver had obtained a protective order against her that prohibited her from having contact with Anna or the caregiver.

As discussed above with respect to subsection (D), DFPS presented evidence that Mother had had trouble with alcohol usage. The removal affidavit contained allegations that Mother had used alcohol during her pregnancy with Amelia, Mother was intoxicated during the April 2022 incident with Anna, and Mother had been intoxicated shortly after Amelia's birth when speaking with Anna's caregiver. Mother also acknowledged that she "blew dirty" on a breathalyzer test around the time of Amelia's removal, which led to her extradition to Montana and subsequent brief incarceration there. A drug test result from June 2023 reflected that Mother tested positive for the presence of "ethyl glucuronide" and "ethyl sulfate" in her urine, but there was no contextualizing evidence of whether this would indicate the consumption of alcohol or the mere presence of mouthwash.

Mother admitted that she had been through a rehabilitation program in connection with a criminal charge prior to the pendency of this case. Mother did not successfully complete this program. Following the June 2023 drug test result, Mother obtained a place at the Santa Maria rehabilitation facility and began

28

treatment on June 29, 2023. She was discharged on July 25, 2023, "due to not following [Santa Maria] rules by inappropriate relationship with another peer." Mother's discharge form reflected that her diagnosis at the time of admission was "Alcohol use disorder, Severe," and the justification for her admission was that Mother "meets the DSMV criteria for alcohol use disorder." Owens testified that due to this discharge, Mother did not successfully complete treatment at Santa Maria.

The Department also presented evidence that Mother did not have stable housing or employment throughout the pendency of the case. The removal affidavit, as well as the trial testimony of both Mother and Father, reflected that they had frequently moved between Montana, Florida, and the Houston area. After Amelia's removal, Mother spent several months incarcerated in the Harris County Jail before she was extradited to Montana. She spent approximately six weeks in Montana before she was allowed to move back to Texas. Over the next several months leading up to trial, Mother lived in different houses with friends, resided at Santa Maria for nearly one month, and moved into a sober living facility days before the first trial setting. Mother did not present lease agreements or any other documentary evidence relating to housing to her caseworker. Mother testified that she could stay at the sober living facility indefinitely as long as she followed the rules of the facility. She was not sure if the facility allowed children, but if it did not, she would be able to move to a facility that did.

Upon returning to Texas from Montana, Mother worked at approximately four or five different jobs. She left each job voluntarily. The week that trial began, Mother obtained a waitressing job at a restaurant. She did not provide verification of her employment, such as paycheck stubs, to her caseworker. *See In re S.R.*, 452 S.W.3d at 362 ("Failure to maintain stability endangers the child's physical and emotional well-being.").

When we consider the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in conduct that endangered Amelia's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E). We therefore hold that the Department presented legally sufficient evidence to support the trial court's finding under subsection (E). But when we consider all the evidence in a neutral light, however, we agree with Mother that the disputed evidence that a reasonable factfinder could not have credited in favor of the subsection (E) finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that the finding was true. *See In re A.B.*, 437 S.W.3d at 503.

The Department argues that Mother "has a history of aggression that endangered the child." It points out that Mother had two pending assault charges in Montana stemming from Mother "pulling a knife on another person," and Father was named as a complainant in one of these charges. DFPS further argues that

Anna's caregiver had obtained a protective order against Mother and that the Department was informed "about a dispute between the parents just before [Amelia's] removal."

The record includes evidence that Mother has two pending assault charges in Montana, one of which named Father as a complainant and the other of which named the boyfriend as a complainant. Both Father and Mother offered some details of the incident that led to these charges.[8] Father characterized Mother's involvement in this incident as "defending herself," stating that the boyfriend had a big knife or machete in his hand and "was going towards" Mother. Mother displayed a knife to defend herself. When Father got in between them, he pulled the knife from Mother's hand and his own hand was cut. Father did not believe that Mother should have been charged with an offense due to this incident. Mother testified that the boyfriend tried to assault her. Although she attempted to file charges against him, the local police officers would not let her press charges. The Department did not present any evidence contradicting Mother's and Father's testimony about the details of this incident.

---

[8] The child's ad litem attorney suggested that Mother was intoxicated during this incident, asking Father: "[I]sn't it true that you have been present when the police have been called because [Mother] has been belligerent and intoxicated?" Father answered, "[y]es," and then stated, "If she was in—defending herself, then I believe she was defending herself being belligerent."

Both Mother and Father unequivocally testified that no domestic violence occurred in their relationship. Owens testified that although a concern about domestic violence was raised in the referral to DFPS, the Department had not been able to confirm allegations of domestic violence. Mother also acknowledged that Anna's caregiver had obtained a protective order against her in October 2022, but the Department did not elicit any details concerning the behavior on Mother's part that led to this protective order.

DFPS also argues that Mother has two separate charges of endangering a child—one in Harris County and one in Montana—and that these incidents constitute a voluntary course of conduct that endangered Amelia. The record, however, contains evidence of only one child endangerment charge: the one in Harris County,[9] to which Mother pleaded guilty and was placed on deferred adjudication community supervision for two years. Mother testified that around 11:00 p.m., she was walking down a sidewalk and pushing Anna in a stroller. She provided the following details about this incident:

> I had a funny looking stroller. It was like a jogging stroller. I tried to go through the grass but me and her [Anna] both were knocking side to side. It wasn't going straight through, so that's why I got in the bicycle lane. It was a very short distance. Probably from that to here. And I went real, real fast. And I guess someone had seen me at a store walking

---

[9] When discussing why her visitation with Amelia had been limited, Mother explained that she had been in jail "[i]n Harris County" for three-and-a-half months on a "child endangerment charge." DFPS's counsel asked what this charge was based on, and Mother replied, "Walking down a bicycle lane."

and appeared to possibly be intoxicated they stated; and, so, the police stopped me.

Mother testified that police officers tested her for alcohol, but she "didn't have any alcohol in [her]."

There was a dispute as to the type of road that Mother was walking along. Mother testified that she was walking on a sidewalk and, briefly, in a bicycle lane. The removal affidavit contained a section referencing Mother's CPS history and stated that DFPS received a referral that Mother "was observed to be pushing [Anna] along [a] state highway while being intoxicated." DFPS found "reason to believe" the allegation of neglectful supervision "due to [Mother] being charged with child endangerment after being found intoxicated walking on an interstate facing towards traffic and near oncoming traffic." Mother had the following exchange with Amelia's ad litem attorney on cross-examination:

Q.	And then you said it's actually a sidewalk a few minutes ago when you were talking to [Mother's counsel]?

A.	It was a sidewalk.

Q.	Okay. The actual indictment says that: On or about May 14th you intentionally and knowingly engaged in conduct that placed [Anna], the child younger than 15 years of age, and hereafter called the complainant, in imminent danger of bodily injury; namely, by being intoxicated. The defendant pushed the complainant in a stroller down a public highway in close proximity to passing motor vehicles—passing motor vehicles and the defendant did not voluntarily deliver—so, basically that—that indictment says you were on a freeway. Do you understand that?

33

A.     I do.

The indictment for this offense was not offered or admitted into evidence. Although the trial court admitted the order deferring adjudication of Mother's guilt and placing her on community supervision, this order and the accompanying paperwork contained no description of the facts underlying the offense.

With respect to a second endangerment charge, Mother testified that at the time of Amelia's removal, she was taking regular breathalyzer tests "[b]ecause of a criminal case." This criminal case "was an assault charge that later on got dropped down to a criminal endangerment charge." When asked about the criminal activity that led to this charge, Mother stated, "I guess the arguing, the back and forth arguing between me and my roommates, and [Father]. At the time, he was there, as well. So, it was an argument." Mother's testimony provided no indication that a child was involved in this incident or that the criminal charge was for endangering a child. DFPS presented no documentary evidence—such as a charging instrument—relating to this offense. The appellate record, therefore, does not support DFPS's assertion that Mother has two charges for endangering a child.

DFPS also relies on Mother's alcohol use as support for the trial court's finding under subsection (E). It is undisputed that Mother has had trouble with alcohol in her life, as she herself acknowledged. DFPS argues that Mother has been to two alcohol rehabilitation programs, "but tested positive for alcohol again after

34

her discharge from Santa Maria." The evidence in the appellate record, however, reflects that Mother's June 2023 drug test—which revealed the presence of ethyl glucuronide and ethyl sulfate in Mother's urine, in some amount that was never explained or contextualized by experts—occurred *before* Mother was admitted to Santa Maria. The test results state that the specimen was collected on June 20, 2023, and received on June 24, 2023. Mother's Santa Maria discharge form states that she was admitted to that facility on June 29, 2023.

Although Santa Maria discharged Mother before she successfully completed the program, she was discharged for having an inappropriate relationship with a peer at the facility, not for using alcohol. Mother testified that she was tested several times while at Santa Maria, and all of her drug tests were negative. The only drug test result contained in the appellate record is the June 2023 result. *Contra In re B.B.*, 971 S.W.2d 160, 168–69 (Tex. App.—Beaumont 1998, pet. denied) (concluding that evidence was legally and factually sufficient under subsection (E) when DFPS presented evidence that mother had violent temper while drinking, she had assaulted and threatened to kill infant child while she had been drinking, she had not stopped drinking despite being given opportunity to attend inpatient treatment, she did not believe she had problem with alcohol, and older child was diagnosed with fetal alcohol syndrome); *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (concluding that evidence was sufficient to support subsection (E) finding when

mother was not properly caring for children, was using illegal drugs, allowed her children to be around her drug supplier, her and supplier used drugs together around children, she supervised children while under influence of drugs, she failed to complete rehabilitation program, and she continued using drugs during pendency of case).

When we consider all the evidence in a neutral light, as we must when conducting a factual sufficiency review of a predicate finding, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the subsection (E) finding was so significant that a reasonable factfinder could not have formed a firm belief or conviction that Mother engaged in a course of conduct that endangered Amelia's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re A.B.*, 437 S.W.3d at 503. We sustain in part Mother's second issue.

### 2. Section 161.001(b)(1)(N)

The trial court may terminate a parent's rights if the court finds by clear and convincing evidence that the parent has constructively abandoned a child who has been in the Department's temporary managing conservatorship for not less than six months and:

> (1)     the department has made reasonable efforts to return the child to the parent;

36

(2)     the parent has not regularly visited or maintained significant contact with the child; and

(3)     the parent has demonstrated an inability to provide the child with a safe environment.

TEX. FAM. CODE § 161.001(b)(1)(N). The first element of this subsection "focuses on the Department's conduct," while the second and third elements "focus on the parent's conduct." *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.). If the evidence is legally insufficient on any of the three elements, we cannot sustain the finding under this subsection. *Id.* Because we conclude that the Department did not present legally sufficient evidence of the second element—whether Mother had regularly visited or maintained significant contact with Amelia—we turn directly to that element.

"A parent fails to regularly visit or maintain significant contact with their children when the parent fails to take advantage of visitation rights or when visits are intermittent or sporadic." *In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *8 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.) (quoting *In re S.S.*, No. 11-05-00083-CV, 2006 WL 1285125, at *3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.)).

The visitation plan implemented for Mother and Father in September 2022 allowed two-hour visits every two weeks. The court approved the visitation plan and made it an order of the court on October 10, 2022. At some point in October 2022,

37

Mother was arrested on the child endangerment charge and incarcerated in the Harris County Jail for approximately three months. Mother agreed with her counsel that she could not visit Amelia during this time.

After pleading guilty to that offense and being placed on deferred adjudication community supervision in January 2023, she was extradited to Montana. Mother was incarcerated in Montana for around a week, but she did not obtain permission to leave Montana for another six weeks. Owens agreed that Mother could not physically visit with Amelia during this period. Mother returned to the Houston area in March, five months before trial, which would have afforded her the opportunity for approximately ten visits—two visits per month—under the visitation plan.

Mother lived with a friend in Galveston for around three months after she returned to Texas, and she did not always have reliable transportation to attend visits. Mother agreed with her counsel that "[i]n the beginning," she was not "very good about these visitations," but she did visit Amelia six times during the pendency of the case. No witness provided testimony concerning when the visits occurred, but Owens testified that Mother's final visit with Amelia occurred when Owens and Foster Mother took Amelia to see Mother at Santa Maria. Mother's inpatient treatment at Santa Maria lasted from June 29, 2023, through July 25, 2023. Trial began on August 3, 2023. Mother testified that she did not intentionally miss visits with Amelia.

The Department focuses on Owens' testimony that under the visitation plan, Mother had the opportunity to visit with Amelia twenty-four or twenty-five times during the year the case was pending, but she visited with Amelia only six times. DFPS cites caselaw from our sister intermediate courts of appeal holding that a comparable number of visits over a similar time—or only occasional or sporadic visits—have constituted legally and factually sufficient evidence that the parent did not regularly visit or maintain significant contact with the child. *See, e.g.*, *In re T.G.*, No. 14-09-00299-CV, 2010 WL 1379977, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2010, no pet.) (mem. op.) (concluding that mother failed to visit regularly when mother visited child "only sporadically" over nine month period, did not visit at all over following seven month period, did not contact caseworker to arrange for visits, and did not make any inquiries about child's health or well-being); *In re R.M.*, No. 14-02-00221-CV, 2003 WL 253291, at *5 (Tex. App.—Houston [14th Dist.] Feb. 6, 2003, no pet.) (mem. op.) (concluding that legally and factually sufficient evidence supported subsection (N) finding when mother visited child six times over approximately sixteen months that case was pending); *In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.) (considering fact that mother "intermittently visited" child over three month period but failed to visit over following five months in upholding subsection (N) finding).

Mother argues that these six visits are evidence that there was no abandonment when accounting for the periods of time during which Mother was incarcerated or in Montana. We agree with Mother. Concerning Mother's visitation, Owens testified: "Mom was visiting the child, then there was some conflicts that she could not get to the visits. She didn't have—she said she didn't have gas money to pay somebody to get her to the visits. And then, again, she was arrested in October of last year [2022]." It is unclear from this testimony whether, or how many times, Mother visited Amelia prior to her October 2022 incarceration in the Harris County Jail. Similarly, there is no testimony concerning how many visits occurred after Mother returned to Texas in March 2023. Mother's last visitation with Amelia occurred while Mother was in inpatient treatment at Santa Maria, and thus likely happened in July 2023.

It is undisputed that Mother was incarcerated in the Harris County Jail, extradited to Montana, briefly incarcerated in Montana, and then required to remain in Montana before she received permission to return to Texas in March 2023. This period lasted roughly five months. *See In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied) (stating that "incarceration alone is not sufficient to constitute abandonment of a child"). Aside from this time period, there is no other evidence of large gaps in time between visits with Amelia. Mother's six visits with Amelia average out to approximately one visit per month that the case was pending,

40

not including the five months Mother was incarcerated or in Montana. There is no evidence that Mother's visits with Amelia all occurred early in the case, followed by no visits at all occurring during the months leading up to trial. *See In re T.G.*, 2010 WL 1379977, at *7 (noting that mother visited child "only sporadically" over nine-month period and then did not visit child at all for following seven months); *In re H.R.*, 87 S.W.3d at 699 (noting that mother "intermittently visited" child over three-month period and did not visit child at all in five months before trial). To the contrary, Owens testified that Mother visited Amelia at least once in the weeks leading up to the commencement of trial.

On appeal, DFPS faults Mother for not inquiring "about virtual visits or phone contact" with Amelia. Amelia came into DFPS's care when she was mere days old. When the trial court approved the visitation plan and made it an order of the court, Amelia was approximately two months old. She celebrated her first birthday in between the two trial settings that occurred in August 2023. At that time, she was just learning to speak. Her extremely young age throughout the pendency of this case makes it unlikely that she and Mother would have been able to have meaningful contact in a virtual or phone setting.

Based on the record before us, even when viewing the evidence in the light most favorable to the trial court's finding, we cannot conclude that a reasonable factfinder could form a firm belief or conviction that Mother did not regularly visit

41

Amelia. *See* TEX. FAM. CODE § 161.001(b)(1)(N)(ii). Thus, there is legally insufficient evidence to support an element of subsection (N). As a result, the trial court's finding under the predicate ground of subsection (N) cannot be sustained. *See In re A.L.H.*, 468 S.W.3d at 744 (stating that if evidence is insufficient to support any of three elements of subsection (N), finding under that subsection cannot be upheld). We sustain Mother's third issue.

### 3. Section 161.001(b)(1)(O)

Another statutory ground for termination of parental rights exists if the trial court finds by clear and convincing evidence that the parent failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Family Code chapter 262 for the abuse or neglect of the child. TEX. FAM. CODE § 161.001(b)(1)(O); *In re R.J.G.*, 681 S.W.3d at 378.

DFPS "may remove an abused or neglected child from the home and seek an emergency order granting the Department temporary possession." *In re R.J.G.*, 681 S.W.3d at 377 (citing TEX. FAM. CODE §§ 262.001, 262.102). Within 45 days after the trial court appoints the Department as a child's temporary managing conservator, the Department must prepare and file a service plan for the parent. *Id.*; TEX. FAM.

CODE § 263.101. Among other requirements, the service plan must be specific, be in writing in a language the parent understands, state steps that are necessary to return the child to the child's home, state the actions and responsibilities that r the parent must undertake to achieve the plan goal, state any specific skills or knowledge that the parent must acquire, and state any behavioral changes that the parent must exhibit. TEX. FAM. CODE § 263.102(a)(1), (2), (6)(A), (7), (8). The trial court must review the service plan and incorporate the plan into the orders of the court. *In re R.J.G.*, 681 S.W.3d at 377; TEX. FAM. CODE § 263.202(b-1).

The order incorporating the service plan "is a mandate or directive that establishes some steps or actions necessary for the parent to obtain return of the child who is in the Department's custody." *In re N.G.*, 577 S.W.3d at 238. The order must be "sufficiently specific to warrant termination of parental rights for failure to comply with it." *Id.*; *In re A.L.R.*, 646 S.W.3d 833, 837 (Tex. 2022) (per curiam) ("Subsection (O) contemplates direct, specifically required actions."); TEX. FAM. CODE § 263.102(d) (providing that service plan must be written "in a manner that is clear and understandable to the parent in order to facilitate the parent's ability to follow the requirements of the service plan"). Subsection (O) authorizes termination of a parent's rights for failure to comply with a service plan "only when that plan requires the parent to perform specific actions." *In re A.L.R.*, 646 S.W.3d at 838.

Even if the Department proves at trial that the parent failed to comply with a specific provision of a service plan, termination of parental rights is "not automatic or required." *In re R.J.G.*, 681 S.W.3d at 379. Both the Texas Supreme Court and this Court "have recognized that it is the violation of 'material' requirements of a plan that justify termination under (O)." *Id.* (collecting cases, including *In re J.F.C.*, 96 S.W.3d at 278–29, and *In re T.L.B.*, No. 01-21-00081-CV, 2021 WL 3501545, at *6 (Tex. App.—Houston [1st Dist.] Aug. 10, 2021, pet. denied)). "[I]f the noncompliance is trivial or immaterial in light of the plan's requirements overall, termination under (O) is not appropriate." *Id.*

This inquiry involves a "nuanced assessment of the parent's conduct and progress toward plan completion in light of the totality of the plan's requirements and overall goal." *Id.* at 381. Courts should consider the nature and degree of the parent's alleged noncompliance with the service plan and the materiality of the disputed requirement in achieving the plan's stated goals. *Id.* For some provisions in a service plan, "nothing less than strict compliance will suffice to avoid termination." *Id.* at 382. On the other hand, other provisions "may be too trivial, in the larger context of the plan and the parent's overall performance, to have their breach give rise to termination." *Id.* However, a parent who fails to comply with one or more material requirements cannot avoid termination under subsection (O) "merely by showing that he complied with the plan's other requirements." *Id.* "[P]arents cannot

overcome the complete failure to comply with a material requirement by arguing that performing other requirements constitutes substantial compliance with the plan overall." *Id.*; *In re J.F.C.*, 96 S.W.3d at 278 ("[T]hese sporadic incidents of partial compliance [with the service plan] do not alter the undisputed fact that the parents violated many material provisions of the trial court's orders.").

Section 161.001(d) establishes an affirmative defense to termination of parental rights based on the failure to comply with a court order:

> A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
>
> > (1) the parent was unable to comply with specific provisions of the court order; and
> >
> > (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

TEX. FAM. CODE § 161.001(d); *In re L.E.R.*, 650 S.W.3d 771, 788 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (stating that section 161.001(d) places burden on parent to establish elements of this defense).

### a. Whether DFPS removed Amelia for "abuse or neglect"

In challenging the sufficiency of the evidence to support the trial court's predicate finding under subsection (O), Mother first argues that DFPS did not present sufficient evidence that it removed Amelia for "abuse or neglect."

Subsection (O) allows a trial court to terminate a parent's rights if the child has been in the Department's custody for at least nine months and the Department proves, by clear and convincing evidence, that the parent failed to comply with a court order that established the actions necessary for return of the child, but this provision applies "only if the child was removed from the parent under Family Code Chapter 262 for 'abuse or neglect of the child.'" *In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013) (quoting TEX. FAM. CODE § 161.001(b)(1)(O)). Family Code chapter 262 does not define "abuse" or "neglect," but chapter 261 "provides a nonexclusive list of acts or omissions constituting 'abuse' and 'neglect' when investigating reports of child abuse or neglect," and these acts or omissions "might be used to inform the terms' use in other chapters" of the Family Code. *In re S.M.R.*, 434 S.W.3d 576, 582–83 (Tex. 2014) (citing TEX. FAM. CODE § 261.001(1), (4), and *In re E.C.R.*, 402 S.W.3d at 248).

In *In re E.C.R.*, the Texas Supreme Court examined the definitions of "abuse" and "neglect" found in chapter 261 and observed that chapter 261 defined the terms "broadly and nonexclusively," and the statutory definitions "explicitly include risk." *See* 402 S.W.3d at 246. For example, the definition of abuse "includes not just actual physical injury, but a 'genuine threat of substantial harm from physical injury'" and the definition of neglect "includes placing a child in or failing to remove a child from a situation that requires actions or judgment beyond his capabilities and that results

46

in 'a substantial risk of immediate harm to the child.'" *Id.* (quoting TEX. FAM. CODE § 261.001(1)(C), (4)(B)(i)).[10] The court also noted that both definitions "include language that permits the consideration of harm to another child in determining whether abuse or neglect has occurred." *Id.*

After describing the statutory procedure that DFPS and the courts must follow when DFPS receives a report of abuse or neglect and believes removal of the child is "necessary to avoid further abuse or neglect," the Texas Supreme Court noted that the standard "used repeatedly throughout chapter 262 is 'danger to the physical health or safety of the child.'" *Id.* at 246–47. That particular phrase "is also centered on risk, rather than just a history of actual abuse or neglect." *Id.* at 247; *see* TEX. FAM. CODE § 101.009 ("'Danger to the physical health or safety of a child' includes exposure of the child to loss or injury that jeopardizes the physical health or safety of the child without regard to whether there has been an actual prior injury to the child.'"). The court concluded that the words "abuse or neglect" are "used broadly," and the terms "necessarily include[] the risks or threats of the environment in which the child is placed," which "includes the harm suffered or the danger faced by other

---

[10] The definition of "neglect" has been amended since the Texas Supreme Court's opinion in *In re E.C.R.* Currently, "neglect" is defined to include, among other things, "placing a child in or failing to remove a child from a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in bodily injury or an immediate danger of harm to the child." TEX. FAM. CODE § 261.001(4)(A)(ii)(a).

children under the parent's care." *In re E.C.R.*, 402 S.W.3d at 248; *see In re S.M.R.*, 434 S.W.3d at 583 ("[W]hether removal under [chapter 262] was for abuse or neglect depends on the surrounding facts and circumstances and is generally determined on a case-by-case basis.").

In arguing that insufficient evidence supports the trial court's finding that Amelia was removed from Mother's care for "abuse or neglect," Mother focuses on the facts that the removal affidavit contained no information concerning the environment in which Mother and Amelia were living at the time of removal, there was no indication that Mother or Father were intoxicated when they met with the caseworker days after Amelia's birth, and the hospital had released Amelia after her birth, indicating she did not have any health problems. The removal affidavit "offers hearsay about matters that may or may not have occurred in Montana" and also referenced the child endangerment charge involving Anna, but these events occurred before Amelia was born, and thus could not be considered as evidence that Amelia was removed from Mother's care for abuse or neglect.

The Texas Supreme Court has held that the terms "abuse or neglect" are broad and include the risks of the child's environment, such as the harm suffered by or the danger to other children in the parent's care. *See In re E.C.R.*, 402 S.W.3d at 248. Here, the removal affidavit reflected that several months before Amelia's birth, Mother had been charged with felony child endangerment—a charge that was still

pending at Amelia's birth—after she "was observed to be pushing [Anna in a stroller] along [a] state highway while being intoxicated." The removal affidavit also contained allegations that Mother had used alcohol while pregnant with Amelia, she had driven with Anna in the car while under the influence of alcohol, and she was intoxicated while speaking with Anna's caregiver days after Amelia's birth.

The factual predicate of subsection (O)—that the child was removed "from the parent under Chapter 262 for the abuse or neglect of the child"—does not require the child to have been actually abused or neglected. *See* TEX. FAM. CODE § 161.001(b)(1)(O); *In re E.C.R.*, 402 S.W.3d at 246, 248. Instead, the terms "abuse or neglect" include risks to the child's safety and well-being, and courts may consider harm or endangering conduct faced by another child in the parent's care. We conclude that the removal affidavit, which set out allegations of Mother's alcohol usage while pregnant and her alleged endangering conduct directed toward Anna, presented some evidence that the Department removed Amelia from Mother's care for "abuse or neglect." *See In re E.C.R.*, 402 S.W.3d at 248–49.

However, when considering all the evidence in a neutral light, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the subsection (O) finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that Amelia was removed from Mother's care for "abuse or neglect." *See In re A.B.*, 437 S.W.3d at 503.

49

At trial, there was scant testimony concerning the circumstances surrounding Amelia's removal from Mother's care. Owens testified as follows on direct examination by DFPS's counsel:

Q. So, Ms. Owens, why did this child come into care?

A. The child came into care of neglectful supervision on the part of the mom. The report stated that—well, it started with the oldest child [Anna] that is placed in Montana. When the case was called in, mom returned back to the state of Texas, and she had the child that we have in custody now, [Amelia]. The case was called in for neglectful supervision of that child.

Q. Okay. So, there's an older child in a different state, and there was a case opened on that child; is that accurate?

A. Correct.

Q. And then mom came to Texas and had another child; is that right?

A. Yes. It was called in on that child. She was pregnant [with Amelia] at the time of the first call-in, and then she took that child [Anna] back to Montana and she returned back to Texas, and that's the child that we have in custody now.

Q. All right. And why was our child, the younger child, brought into custody?

A. There were allegations of domestic violence with the parents. Also, mom had a child endangerment charge that she's now on probation for. And it was just neglectful supervision of the children.

The only other information concerning Amelia's removal that is in the appellate record is the removal affidavit.

As we have discussed with respect to subsection (D), the removal affidavit contains no information concerning the environment in which Mother, Father, and

50

Amelia were living at the time of removal, except for the fact that they were living in a motel. There is no evidence addressing the cleanliness of the motel room, whether there were safety hazards present, whether dangerous individuals were present in the room, whether Amelia was not appropriately dressed, whether Mother left Amelia alone in the room, whether Mother or Father was intoxicated when they met with caseworkers, or whether drugs or alcohol was present in the room. The removal affidavit raised a concern of domestic violence, noting that Mother and Father had been overheard having an argument by a member of the motel's staff, but there is no evidence any violence actually occurred between them. To the contrary, both Mother and Father testified that no domestic violence ever occurred during their relationship, and Owens agreed that the allegations of violence had not been confirmed.

The removal affidavit referred to the child endangerment charge, stating:

[A] third report was called in after [Mother] was observed to be pushing [Anna] along [a] state highway while being intoxicated. [Mother] was arrested and charged with child endangerment. The allegations of Neglectful Supervision [were] found reason to believe due to the mother being charged with child endangerment after being found intoxicated walking on an interstate facing towards traffic and near oncoming traffic.

It is undisputed that Mother pleaded guilty to this child endangerment charge, the criminal court deferred adjudication of guilt, and that court placed her on community supervision for two years.

51

This incident occurred before Amelia's birth and during Mother's pregnancy. As we have discussed with respect to subsection (E), Mother testified concerning this incident and disagreed that she was pushing Anna in a stroller along a highway or a freeway and that she was intoxicated at the time. The Department did not present any contradictory evidence. The ad litem attorney read most of the indictment for this offense into the record and asked if Mother understood the allegations, but neither the ad litem attorney nor DFPS introduced the indictment into evidence.

Furthermore, although the removal affidavit contains allegations that Mother drank alcohol during her pregnancy with Amelia and was intoxicated when Anna's caregiver spoke to her a few days after Amelia's birth, no corroborating evidence appears in the appellate record. Mother admitted that she had a problem with alcohol usage, but she did not testify that she drank alcohol during her pregnancy with Amelia. Instead, she testified that she was not drinking around the time of Amelia's removal because she had been taking regular breathalyzer tests "every 12 hours . . . for a consecutive few months" due to a pending criminal case in Montana.[11] No party introduced Mother's or Amelia's medical records from Amelia's birth. There is, therefore, no evidence that Mother tested positive for alcohol at the time of Amelia's birth, that Amelia tested positive for alcohol, or that Amelia suffered any negative health effects if Mother had been drinking during her

---

[11] Mother admitted that she drank alcohol after DFPS removed Amelia from her care.

pregnancy. Mother and Amelia were released from the hospital within days of Amelia's birth, and Foster Mother testified that one-year-old Amelia had no health concerns. And Mother has no convictions for alcohol offenses.

The risk of abuse or neglect to Amelia was therefore entirely based on ultimately uncorroborated allegations that Mother had drunk alcohol during her pregnancy and just after Amelia's birth, ultimately uncorroborated allegations that Mother and Father had engaged in domestic violence around the time of Amelia's birth, and the factually-disputed incident involving Anna several months before Amelia's birth. There is no evidence that Amelia suffered any physical harm or was in immediate danger of suffering harm at the time of her removal.

The Texas Supreme Court has concluded that a child removed from her mother shortly after her birth was removed for "abuse or neglect," but that case is factually distinguishable from this case and does not compel the same result here. In *In re K.N.D.*, DFPS received a referral for "neglectful supervision" the day after the child was born, while the child was still in the hospital. *See* 424 S.W.3d 8, 9 (Tex. 2014) (per curiam). The referral reported that the mother—who worked as a prostitute—had been involved in a dispute with her roommates—one of whom acted as her pimp—when she was thirty-seven weeks pregnant. *Id.* The mother fell down, had to be taken to the hospital, and then gave birth. *Id.* Upon further investigation, DFPS learned that one of the roommates had kicked in the mother's apartment door

53

and chased her, causing her to fall. *Id.* DFPS also learned that two weeks prior to the child's birth, the mother had relinquished her parental rights to an older child, for whom the mother "had a history of 'neglectful supervision' and 'medical neglect.'" *Id.* In light of its previous decision in *In re E.C.R.*, the Texas Supreme Court concluded that the child had been removed from the mother's care for abuse or neglect. *Id.* at 10; *see also In re T.W.*, No. 05-16-00232-CV, 2016 WL 3437589, at *5 (Tex. App.—Dallas June 21, 2016, pet. denied) (mem. op.) (concluding that evidence was sufficient under subsection (O) to show parents' fifth child was at "'substantial risk' of abuse or neglect" when, at time of child's birth, DFPS had case involving parents' four older children "proceeding towards termination" of parents' rights, father was accused of domestic violence against mother and children, youngest of older children had tested positive for marijuana at birth, and parents would not cooperate with DFPS in locating fifth child to ensure she was in safe environment).

Here, by contrast, although there was an allegation that Mother and Father argued shortly after Amelia's birth and DFPS was concerned about the possibility of domestic violence, Owens agreed that this allegation was not confirmed. DFPS presented no evidence of danger of physical harm to either Mother or Amelia. The only evidence that Mother had been drinking during her pregnancy and around the time of Amelia's birth was uncorroborated statements contained in the removal

54

affidavit. And although Mother had been charged with child endangerment of Anna—and Mother pleaded guilty to this offense and was placed on deferred adjudication community supervision—Mother disputed the facts of that offense, she denied that she was intoxicated during that incident, and the indictment was not offered or admitted into evidence.

When we consider all the evidence in a neutral light, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the subsection (O) finding was so significant that a reasonable factfinder could not have formed a firm belief or conviction that Amelia was removed from Mother's care for abuse or neglect. *See* TEX. FAM. CODE § 161.001(b)(1)(O); *In re S.M.R.*, 434 S.W.3d at 583 ("[W]hether removal under [chapter 262] was for abuse or neglect depends on the surrounding facts and circumstances and is generally determined on a case-by-case basis."). We conclude that factually insufficient evidence supports the trial court's finding under subsection (O). We therefore sustain in part Mother's fourth issue.

### 4. Section 161.001(b)(1)(P)

The Family Code also allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent used a controlled substance as defined by Health and Safety Code chapter 481 in a manner that endangered the health or safety of the child and:

(1)    failed to complete a court-ordered substance abuse treatment program; or

(2)    after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance.

TEX. FAM. CODE § 161.001(b)(1)(P); *In re A.Q.W.*, 395 S.W.3d 285, 290 (Tex. App.—San Antonio 2013, no pet.), *overruled on other grounds by In re J.M.T.*, 617 S.W.3d 604 (Tex. App.—San Antonio 2020, no pet.) (en banc).

Health and Safety Code chapter 481 defines "controlled substance" as "a substance, including a drug, an adulterant, and a dilutant, listed in Schedules I through V or Penalty Group 1, 1-A, 1-B, 2, 2-A, 3, or 4." TEX. HEALTH & SAFETY CODE § 481.002(5). The Commissioner of the Department of State Health Services, which maintains the schedules of controlled substances, "may not" include "distilled spirits, wine, malt beverages, or tobacco" on the schedules. *Id.* § 481.033(b)(2). Alcohol is not listed on the schedules of controlled substances maintained by the Department of State Health Services or in any of the penalty groups found in the Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ch. 481, subch. B, app. A (schedules of controlled substances); *id.* §§ 481.102–.105 (penalty groups).

Although the Department presented evidence that Mother tested positive for alcohol usage during the pendency of this case, it presented no evidence that Mother had used a controlled substance. We agree with Mother that legally and factually

insufficient evidence supports the trial court's finding that she violated subsection (P). We sustain Mother's fifth issue.

In sum, we hold that the trial court's findings under subsections (D), (N), and (P) were not supported by legally sufficient evidence. We also hold that the court's findings under subsections (E) and (O) were supported by legally sufficient evidence but not factually sufficient evidence. Because we conclude that none of the five predicate grounds contained in the termination order were supported by both legally and factually sufficient evidence, we need not address Mother's sixth issue, whether legally and factually sufficient evidence supported the trial court's finding that termination of Mother's rights was in Amelia's best interest. *See* TEX. FAM. CODE § 161.001(b) (requiring findings, by clear and convincing evidence, of both predicate ground and that termination is in best interest of child; *In re L.M.*, 104 S.W.3d 642, 646 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("Both elements [of section 161.001(b) must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact."); *see also In re J.O.A.*, 418 S.W.3d 625, 626 (Tex. App.—Amarillo 2009, no pet.) (stating that remand for new trial is appropriate disposition on appeal when appellate court holds that evidence is legally sufficient but factually insufficient to support termination of parent's rights).

We note, however, that Mother has not raised an appellate issue challenging the portion of the trial court's order appointing the Department as Amelia's sole managing conservator. We must therefore affirm that portion of the order. *See In re J.A.J.*, 243 S.W.3d at 615–17 (concluding that when trial court terminated parent's rights and found that appointment of parent as child's managing conservator would not be in child's best interest because it would significantly impair child's physical health or emotional development, challenge to conservatorship portion of decree "was not subsumed" in appellate challenge to termination portion and therefore had to be raised in separate issue); *In re N.L.S.*, No. 01-23-00297-CV, 2023 WL 6627526, at *36 (Tex. App.—Houston [1st Dist.] Oct. 12, 2023, no pet.) (mem. op.) ("Because father did not challenge the portion of the trial court's order naming DFPS the sole managing conservator of N.L.S., we affirm that portion of the trial court's order).

## Conclusion

We affirm the portion of the trial court's order appointing the Department as Amelia's sole managing conservator. We reverse the portion of the trial court's order terminating Mother's parental rights to Amelia, render judgment denying the Department's petition for termination of Mother's parental rights under Family Code subsections 161.001(b)(1)(D), (N), and (P), and remand this case for a new trial on

the Department's petition for termination of Mother's parental rights under Family Code subsections 161.001(b)(1)(E) and (O).


April L. Farris
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.